Good morning, Your Honors. My name is Victor J. Torres from the law firm of Gordon Thomas Honeywell. Here on behalf of the appellant, Lauren Wisnott, the plaintiff in the court below. Okay, and if you could keep your voice up. Thank you. As a preliminary matter, I'm going to ask for a request of three minutes for my time for rebuttal. You can reserve whatever time you want. We'll try and help you, but do try and keep your eye on the clock. Certainly, Your Honor. We'll do the best we can. And also, I would like to express my appreciation that as a second-year associate at a law firm, arguing before the Ninth Circuit is both a privilege and an honor, so I wanted to express that. I hope you feel the same way afterwards as you did. I'll let you know. So, on with the arguments. This court should reverse the trial court and remand this case back for trial because the trial court improperly applied the standard under Rule 702 in Daubert and subsequently excluded both of Mr. Wisnott's experts and made judgments with respect to the credibility and weight of the testimony and the evidence as opposed to making determinations of invisibility. Now, in doing so, Mr. Wisnott was unjustly and unfairly prejudiced because the district court excluded both of his experts, especially those of Dr. Baker, whose testimony went to the issue of medical causation, and ultimately the trial court granted the respondent's motion for summary judgment. But in this case, counsel, are we not to review the district court's action under an abusive discretion standard of review? You're absolutely correct, Your Honor. Okay, so in this case you've got, this is basically a scientifically-based set of allegations. The district court found that the incutaneous skin test was not reliable, found that the antibody blood tests conducted by immunoscience labs were unreliable, all based on scientific information, and that Dr. Baker failed to perform a proper differential diagnosis to eliminate other causes of your client's symptoms. Isn't that the very kind of issue that Rule 702 and Daubert were designed to leave to the discretion of the district court? What is left to the discretion of the district court is to determine what is the methodologies and whether or not those are scientific. What the respondents and what the district court relied upon are evidence relating to the scrutinization of what Dr. Baker performed and his interpretations. Well, let's take the immunoscience laboratory, for example. His testimony relied on the results, and yet the U.S. Department of Health and Human Services informed Dr. Baker in January of 2006 that tests received from that lab since June 2002 may not be reliable due to the lab's deficient practices. How can that be an abuse of discretion by the district court to say that an expert witness who is relying upon lab tests, which the department supervising these sorts of things says is not reliable, how can that be an abuse of discretion? It's an abuse of discretion, Your Honor, simply because what the district court had before it was this letter that said that it may be unreliable. The respondents also relied upon, and the district court relied upon, a case. I believe it was in California, the silicon breast implant case that stated... Gethikin versus D'Andrea? I believe that it might be the silicon breast implant case, and that might be the name of it. I don't recall that offhand, Your Honor. But in that case, the district court stated that the lab created a different test and a different standard by which to test the evidence. That's not what you have in this case. What you have is Dr. Baker testifying in his deposition that he relied upon peer-reviewed articles that state that blood tests are reliable. But Daubert allows the consideration of the acceptance of the methodology in the scientific community, doesn't it? That's correct. And in this case, you've got clear evidence from the supervising governmental agency that this evidence may not be reliable. That's the very function, is it not, that the trial court is supposed to play? You're absolutely right, Your Honor. But I'm not sure that may not be reliable is determinative in this case. Well, somebody has to decide, right? In this case, it's the district judge. I think you would agree with that. I would. So if the district judge is going to decide it, then you say, well, on what basis does the district court decide? Well, according to Daubert and according to 702 and the other cases that we've talked about here, he takes into account, among other things, whether the methodology used is acceptable in the scientific community. He concluded that it was not. Under the circumstances, he determined to exclude the testimony. Now, under that format, I guess my question is how can that be an abuse of discretion? It's an abuse of discretion because the methodology, the lab tests, are capable of scrutiny. Now, the scrutiny, the results of the scrutiny, such as maybe there's a mistake or a fault within the steps taken in order to perform the methodology, those results may be used to either enter evidence to refute and or provide contradictory evidence that Dr. Baker's conclusions are not correct. How about the fact that Dr. Baker didn't consider all the other symptoms of your client, including gastroenteritis, anemia, leukopenia, and post-nasal drip? He apparently didn't take those into account, and yet those could each explain, in part, his symptoms. What role, if any, did the district court have in applying that determination to whether Dr. Baker's testimony was reliable? Dr. Baker did not do anything different than what the respondents' experts did. Dr. Baker reviewed all of his medical history, Mr. Wisnot's medical history, and also reviewed the Martin Systems environmental report, stating that certain molds were current and available, and that Mr. Wisnot was exposed and that he had the same symptomatology that those mold strings could have produced. Now, Dr. Baker simply concluded that it was as a result of the mold exposure. The respondents' experts concluded that it was just a result of GERD. Now, both experts are taking into account and relying upon different things, but the methodology of excluding certain things in order to come to the conclusion that his symptomatology was caused by something, whether it's mold or GERD, is reliable. Let me ask you this. I should know the answer to the question, but I do not. If this had gone to trial, was this going to be a jury trial or a bench trial? Under the Federal Tort Claims Act, Your Honor, I do believe that it would have been a bench trial. Okay. That's my impression, but I did not look it up before our argument. So you're coming right back in front of this judge on the question of weight to be attached? Unfortunately, yes, Your Honor. Okay. But it's also important to note that what is unfairly prejudicial here is that the district court is making determinations with respect to the weight and credibility during the 702 standard test, and that's what is prejudicing Mr. Wisnott at the summary judgment stage, because at the summary judgment stage, had Dr. Baker been able to testify and provide his conclusions and opinions, there is certainly more than enough evidence to provide that there was a genuine issue and a material fact, especially with respect to the issue of medical causation. Another problem that has not yet been alluded to with Dr. Baker's methodology, Dr. Spector, the expert for the other side, the guy from UCLA, says that if this were mold causing his symptoms, you would expect that the symptoms would have disappeared by the time Dr. Baker saw him. That is to say, there would be allergic reactions, and so long as he was actively being exposed, he would be evidencing the symptoms, but here we are a year plus after he's no longer being exposed, yet Dr. Baker attaches the symptoms he's suffering as he walks into Dr. Baker's office to the exposure. What do I do with that? Because that strikes me as a problem with, I don't think weight, but methodology. That just sounds like Dr. Baker didn't understand or overlooked what an allergenic reaction will produce and for how long. Well, I think what the district court at least had before it with Dr. Baker's deposition testimony during the original motion to exclude was the fact that Dr. Baker stated that Mr. Wisnott, as a result of the 11 years of exposure to the mold, became hypersensitive and those reactions continued. Now, Dr. Baker also relied upon the fact that during his physical examination of Mr. Wisnott, Mr. Wisnott stated that, yes, I feel somewhat more distressed when I am at the workplace as opposed to anywhere else. Now, performing that differential diagnosis, going back to that, it's clear that Dr. Baker was able to conclude, based upon the scientific methodology, that Mr. Wisnott's symptomatology was caused by the mold strains at the Bangor facility. But what do we do with the problem of the molds to which Dr. Baker concludes Mr. Wisnott was exposed are found in the wall, but given the timing of the testing of the air, there's no showing of any of them actually having been in the air. That is to say, it's possible to conclude that the molds that are, according to Dr. Baker, causing the problem, they were confined in the wall during the relevant exposure period. I'm glad that you brought that question up, Your Honor, because this is a perfect example of what Mr. Wisnott could do in attacking the credibility and weight of the respondents' experts. If you look at the Martin Environmental Systems report, they performed the bulk testing as well as the air sampling tests. And the bulk sampling revealed that there was different mold strains such as stachybotrys, aspergillus, and penicillium. Now, in the air sampling, the reports revealed that none of those mold strains had aerosolized. The problem with the air sampling test, and this argument would go to the weight and the credibility of the respondents' experts and not the admissibility, would be that during the air sampling, and the methodology is spelled out in that report, that they used an air compressor, they located it centrally within the room, they turned it on for 10 minutes, and captured the air samples. It's commonly known, and it's in the briefing, that for certain mold strains, including stachybotrys and the others that I've just mentioned, in order for them to aerosolize, they must be agitated. Now, in that methodology that Martin Systems has laid out, there's no evidence in there that they've agitated the environment, such as when Mr. Wisnott was in the meat cutting room facility for four to seven hours a day working. Again, that goes to the weight and credibility of the scientific methodology of the air sampling, and not the admissibility of that test. Was that attacked in the summary judgment materials that you submitted? I believe it was, Your Honor. And again, the fact that the respondents' experts relied upon the air sampling, as opposed to Dr. Baker, who relied upon the bulk sampling, those go to the weight and credibility of the experts' testimony and conclusions, and not the admissibility. The tests themselves are scientific methodology that are reliable, just as the three mold tests and allergy tests that Dr. Baker performed, the percutaneous skin test, the intracutaneous skin test, and the blood work. Those are all scientific methodologies that can be tested and scrutinized. This, in a sense, is off to one side from the expert qualification issue, the Daubert issue, but let me understand as best I can just the physical configuration of the workplace. These molds were in the walk-in fridge, is that right? Were they elsewhere? Your Honor, they were in the meat cutting room facility, and I believe that there was a counter that was adjacent to the wall that Mr. Wisnott worked on in order to wrap fish. And that's why I say that it's important to note that the agitation in the air sampling did not occur because Mr. Wisnott would be there wrapping fish and perhaps agitating the wall. But you may or may not be able to answer this fully, and I'm just trying to understand sort of as it were the geography of the workplace. Sure. The wall, I gather it's a walk-in fridge that's the source of the problem. That's where most of the mold is, and it's a wall to the walk-in fridge, is that right? As much as I gather from the evidence, Your Honor, yes. How much time did Mr. Wisnott actually spend going in and out of the walk-in fridge? That is to say, he's not doing the meat, he's doing the fish. Do we know whether he goes in and out of that very often, where the fish are stored? I could not tell you exactly, Your Honor. Okay. And I say it's really off to one side from the Daubert issue. Okay. Correct. I'm going to spend a brief moment speaking about the case that I think is instructive in this matter, and that's the Kennedy v. Collagen case, and that's at 161 F. 3rd, 1226. This is a 1998 Ninth Circuit case, and I believe, Judge Thompson, that you might be familiar with this case since you sat on that panel. That case stood for the proposition that, well, what this court did was reverse the trial court because at the summary judgment motion, it excluded the plaintiff's expert because it determined that the plaintiff's or the expert's conclusions were not based on scientific reasoning. And what this court did was they reviewed all the evidence that the expert looked at and relied upon, and they saw that the expert relied upon peer-reviewed articles, his personal examination, the medical records, and third-party tests. And that's what you have in this case here. You have the fact that Dr. Baker relied upon peer-reviewed articles, his tests, the Martin Systems environmental report, as well as a differential diagnostic. And so that's why that case is instructive, because that case reversed the district court and remanded that case for trial. Under our case law and Daubert, does each element of Dr. Baker's proposed testimony have to be faulted by the judge, or can just one or two of these elements be faulted in order to enable the judge to exclude the testimony of Dr. Baker? Judge Smith, when you say faulted, are you referring to, like, specific tests? Well, for example, the lab, for example. You've got information from the Department of Health and Human Services that those tests may be unreliable. So there's an indicia of unreliability in part. Then you've got the skin tests and so on. There were other elements about that that the court apparently found. My question is, under our case law and under Daubert, does the court have to find fault with every aspect of what Dr. Baker was going to testify according to his deposition, or only part of it? I think that's an important question, because ultimately what the district court did was exclude the entirety of Dr. Baker's testimony. And essentially what the trial court did was stated that the intracutaneous skin tests and the blood tests were, according to the district court, not reliable. And again, it's our position that those attacks go to the weight in credibility, not in disability. Even if this court finds that the district court was correct in excluding those two specific tests, you still have the differential diagnostic that Dr. Baker performed that he relied upon. You still have the Martin Systems environmental report that shows that, and this goes to the issues of general and specific causation. It sounds like you're construing Daubert to mean that you don't exclude the expert. You let the expert go on and then you exclude testimony about contested areas dealing with the weight of the testimony, as opposed to excluding the expert. Is that my understanding of you correctly? That's correct, Your Honor. What we are saying is that if the district court is correct in excluding those two tests, then Dr. Baker's testimony with respect to those two tests, his opinions based upon the reliability on those two tests should then be excluded if it goes to the issue of admissibility and not weight and credibility. If it goes to the issue of weight and credibility, then his conclusions and opinions and that evidence should still be in play, and that stuff can be attacked either at trial or at the summary judgment stage or at a proper Daubert motion hearing. You're down to a minute and 20 seconds. Why don't we hear from the other side, and then you'll have a chance to respond. Thank you, Justice Walker. Good morning. My name is Christina Falk. I represent the United States of America. I'd like to clarify a few factual what I believe to have been the statements by my counsel, who was not trial counsel at the time that these motions were pending. A few matters. Number one, the mold was not found inside a cooler. It was found in a wall adjacent to the meat department room, and a cooler and a bathroom was on the other side of the wall, so it was between a wall. There was a leak. I'm sure you got your description well in mind, but I didn't understand it exactly. So where is the ñ okay, it's more than a wall. It is a partition wall where on one side is a bathroom and a cooler against that wall, but Mr. Wisnet was inside the meat room, which is adjacent to that wall. The wall is a partition wall. I see. So on one side of it there's a cooler, and separate from the cooler, but also on the other side are the bathroom, and then he works in the meat room. That's correct. And so the testimony we have about mold on the carcasses and so on, that's in the fridge and the cooler, correct? Yes, that's correct. And I don't believe there's any testimony about mold on carcasses, Your Honor, but I could be wrong. I think there was, but I might be wrong. Okay. I think I got it. A few other matters. First of all, with regard to the immunosciences test, the court's correct that in 2006 Dr. Baker was specifically required to be told by immunosciences through its agreement with DHHS that, in fact, the scientific testing was not valid and that physicians should consider other methods of testing. In addition, the Quad AI, which is the American Academy of Asthma, Allergy, and Immunology, which Dr. Spector, who was the United States expert, was the chairman of the practice parameters and currently on the task force for the practice parameters. When you look at the practice parameters of which Dr. Baker is a member, Dr. Spector's name appears on them. In addition to discussing the invalidity of immunosciences, besides the fact that it's a totally void test because it is inaccurate, in 2005 the Quad AI came out and said that you cannot use these types of mold testing that immunosciences was using. So it was really two areas where the trial court could easily have relied on. To follow up on my question to opposing counsel, under Daubert and under our precedence, if the trial court finds, for example, two or three areas of Dr. Baker's testimony that it believes disqualify him under Rule 702, he or she, if you have a female trial judge, may exclude that testimony even though there may be other portions of the deposition or the testimony in the summary judgment stage, if that's where you get, that are perhaps accurate or at least worthy of admission. I believe that's probably true, Your Honor, but in this instance I think the judge was well-grounded for every basis that he had. Okay, so from your perspective, there is simply nothing that Dr. Baker was going to testify that was solid and was not contested by other scientific information? Not only was not contested, I think if you look at the issues of reliability and methodology, which Daubert requires, the judge was very well-grounded in his decision. We've already discussed immunosciences very briefly. I'd like to talk about the intercutaneous test, which is the other test that he performed. Once again, Dr. Spector, the chairman of the Quad AI practice parameters, specifically said the test was performed improperly because he did not use a negative control, and also it was interpreted improperly under the guidelines of the Quad AI and the supposed treatise that Dr. Baker originally testified that he was relying on. Had he been relying on it, he could not have interpreted that as a positive result. The suggestion that Dr. Baker testified that peer review articles existed concerning the validity of immunosciences I don't believe is anywhere in the record as well. The court has also discussed the lack of the temporal relationship in terms of the differential diagnosis. I think it's much worse than what the court had suggested. The court suggested it was a few months to a year. It was four years. Mr. Wisnatt was allegedly exposed to mold in 2000, and it was immediately remediated. In 2002, he went to see Dr. Baker. He quit working in his capacity where he was in and out of the meat market a year before. He was still Dr. Baker wrote his report in 2006. So this notion that this allergy somehow continued over time, really the temporal relationship is- I understand when he wrote the report. When did Dr. Baker do the testing upon which he based the report? He tested him in 2002, and the report was written in 2006. In addition, I think- But the reporting, the results of the test that were performed in 2002? Yes, which would have been two years after the exposure supposedly occurred. Okay, but you said four years, so that's not quite right. Well, what I'm suggesting, Your Honor, is the notion that the temporal relationship of the continued coughing, that report was written in 2006. Okay, let me ask you the same question I asked the opposing counsel, and you may know the answer to a certainty. Is this going to be a bench trial or a jury trial? It is a bench trial, Your Honor. It is a bench trial because of the Federal Drug Claims Act. That's correct, Your Honor. The other thing I'd like to mention is the suggestion that somehow Dr. Baker actually considered gastric reflux disease and ruled it out. He did not. I would ask the court to look at page 936 and 937, which is Dr. Baker's trial-his deposition testimony, where he specifically said that he was unaware that Dr. Reinertsen, who Dr. Reinertsen was, that is his treating gastroenterologist, who diagnosed him with GERD, found the bleeding ulcers, treated him, and for which Mr. Wisnet admits that his cough is now better because he's been treated for GERD. So I don't believe that in any way, shape, or form you could suggest that he performed a proper differential diagnosis. In his belated declaration that counsel offered for reconsideration, Dr. Baker simply doesn't say that he considered GERD. He simply says that other people were treating him for it, so he didn't feel it was necessary to look into it, when all of his treating physicians, in fact, say that they could not rule out GERD as a cause. And in addition, I'd like to briefly talk about the bulk samples, since those were raised, the, quote, choice to rely on the bulk samples and not to look at the air samples. Once again, that still is a Daubert issue. Dr. Spector pointed out that in 2005, the Quad AI specifically said not to look at bulk sampling methods when diagnosing an allergy. It's not within the practice parameters to do that. In addition, for support of that, Mr. Wisnatt originally saw a treating environmental health doctor, Dr. Kaufman. Dr. Kaufman, without referring to any type of practice parameter, simply stated that you can't look at bulk samples. He would have had to have seen an air sample to render an opinion. And this court in Killian affirmed a similar decision where a trial court said you can't base it at that point. The trial court was striking an expert that referred to mold in carpet samples from which you would extrapolate an air level. The trial court struck the testimony and granted summary judgment, and this court summarily affirmed. I would suggest that in this case, we're clearly similarly situated. In addition, I'd like to discuss briefly the intake sheet. There's been some representation that Mr. Wisnatt told Dr. Baker that he was more sick at work than he was at home. The United States has carefully set forth, I believe it's on page 19 of our brief, the actual intake sheet that Mr. Wisnatt completed, which is, you know, are you more sick at work? No. Are you better when you're at home? No. It listed 21 instances for Mr. Wisnatt to write down where are you more sick at all these locations. Mr. Wisnatt checked none of them and instead hand wrote, I cough everywhere. And I think that to the extent that that differential diagnosis, when you don't consider the clear problems with regard to GERD, which worsened by 2004, and all of his treating physicians suggesting that they believe there was a clear relationship between his early symptoms of mere heartburn prior to developing into ulcers and cough, and Dr. Baker's failure to look at those issues clearly would render any differential diagnosis without meaning. And I believe that's very consistent with Claussen, where this court said that you could, in fact, strike expert testimony if they fail to rule out these clear other potential causes. I have nothing further at this time. Further questions from the bench? No. Thank you. Response? Thank you, Your Honors. Opposing counsel has stated that there was no deposition testimony with respect to the peer-reviewed articles of the blood tests that Dr. Baker relied upon. Those, in fact, can be found at ER0150, page 173 of his deposition, where he mentions Dr. Gunnar Huser as well as Dr. Bojani. Those are two experts that state that blood tests are reliable with respect to mold. Now, as far as the intake sheet versus what Mr. Wisnot told Dr. Baker during his examination, those might be two different things. The intake sheet might very well say, and I'm sure it does, that he doesn't feel any different either at the workplace or anywhere else. His examination, however, during the examination, he told Dr. Baker that he does, in fact, feel different. Now, it is well established that a patient's self-reported history cannot be the basis to exclude an expert's opinion. Now, because the respondent's experts relied upon the intake sheet versus what Dr. Baker relied upon, the examination, that does not put Dr. Baker's testimony and opinion in the realm of inadmissible testimony. Okay, you're over, but if you have a paragraph or two with which you want to finish up, feel free. Thank you, Your Honor. Again, I would just reiterate that the case of Kennedy Ecology is instructive in this matter, and in that case, and I'll leave it with this, it's cited to a case where it stated that disputes to the strength of an expert's credentials, faults in his use of a particular methodology, or lack of textual authority for his opinion go to the weight, not the admissibility of his testimony. And again, that was Kennedy citing McCulloch v. HB 4, Company 61, F3, 1038. Thank you. Thank you very much, Mr. Torres and Ms. Falk, for your helpful arguments. The case of Wisnat v. United States is now submitted for decision. The last case on our argument calendar this morning is Midcontinent Casualty Company v. Titan Construction Corporation.
judges: Thompson, Fletcher, Smith